tional under the Fourth Amendment and Article I, § 8.

The order of the trial court finding § 6308(b) unconstitutional is reversed. Since the trial court only determined there was not probable cause for Officer Stephens to stop appellee, we remand to the trial court to determine if Officer Stephens had reasonable suspicion to stop appellee's vehicle.

Jurisdiction relinquished.

Former Chief Justice CAPPY, and former Justices NEWMAN and BALDWIN did not participate in the decision of this case.

Chief Justice CASTILLE and Justice BAER join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

While I agree with the majority that the rationale justifying allowance of a *Terry* stop founded upon reasonable suspicion (as opposed to probable cause) implicitly assumes that further investigation is possible, I do not see any need in the present matter to make such investigative potential a specific element of the constitutional test, particularly as this case does not implicate the issue. *See* Majority Opinion at 114–16 (affirming that additional evidence can be obtained in an investigative stop for suspicion of DUI). *See generally United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (developing that a *Terry* stop of a vehicle is justified so long as the officer harbored an objectively reasonable suspicion that the driver violated the law, in light of the totality of the circumstances surrounding the stop). The majority proceeds under the supposition that certain vehicle violations cannot be investigated further by stopping the vehi-

cle; however, notwithstanding the majority's recitation of various circumstances as set forth in *Commonwealth v. Sands,* 887 A.2d 261, 270 (Pa.Super.2005) (referencing driving at an unsafe speed, running a red light, and driving the wrong way on a one-way street), there are many instances in the case law where the driver makes an inculpatory statement to the officer following the stop. Such statements—assuming they are voluntary—may be relevant to the investigative purposes of the stop. Accordingly, I join the result reached by the majority but dissociate myself from its discussion of limitations on an officer's "legitimate expectation of investigatory results." Majority Opinion at 114.

**CONSOL PENNSYLVANIA COAL COMPANY**

v.

**The FARMERS NATIONAL BANK OF CLAYSVILLE and Jon Holbert Carter and Patricia W. Carter.**

**Appeal of Jon Holbert Carter and Patricia W. Carter.**

Superior Court of Pennsylvania.

Argued May 21, 2008.

Filed Sept. 10, 2008.

Reargument Denied Nov. 24, 2008.

Stephen D. Marriner, Jr., Washington, for appellants.

Richard J. Amrhein, Washington, for appellee.

BEFORE: MUSMANNO, POPOVICH and HUDOCK, JJ.

OPINION BY HUDOCK, J.:

¶ 1 This is an appeal from the Judgment entered in favor of Consol Pennsylvania Coal Company (Consol) and against Jon Holbert Carter and Patricia W. Carter, his wife (the Carters), in a quiet title action, wherein Consol was awarded fee simple title to the coal rights to a tract of land to which the Carters own the surface estate. For the reasons that follow, we reverse and remand for proceedings consistent with this opinion.

¶ 2 The trial court has ably summarized the undisputed facts and procedural history of the action as follows:

> This case originated when [Consol] filed a Complaint in Action to Quiet Title for Real Estate consisting of the coal estate referred to as the "Quiet Title Tract" and named the Farmers National Bank of Claysville and [the Carters], the owner of the surface estate, as defendants. [The Farmers National Bank of Claysville has been dissolved, and no successor corporation found; the Petition to Quiet Title was granted against this defendant and is not a subject of the within appeal.] [The Carters] filed Preliminary Objections which were denied, and thereafter filed an Answer and Counterclaim. A trial was held on the merits of all claims on August 16 and 18, 2006.

> \* \* \*

> The Quiet Title Tract consists of coal in the Pittsburgh Vein of Coal through which Consol intends to longwall mine. The Quiet Title Tract is described as follows:

> > ALL the Coal of the Pittsburgh or River Vein in and under all the following described tract of land, situated in East Finley Township, Washington County, Pennsylvania bounded and described as follows, to wit:

> > BEGINNING at a post; thence by lands of the said Francis Moffitt, North 7° West 23.4 perches to a white oak; then South 71° East 24.4 perches to a post; thence by land of the said Joseph Carroll, South 37° West 15.2 perches to a hickory; thence South 76½° West 11.4 perches to the place of the beginning, Containing One (1) acre, three (3) roods and twenty (20) perches, strict measure.

> > THIS being the Pittsburgh or River Vein of Coal underlying the tract of land conveyed by deed of Joseph Carroll, et ux., to Francis Moffitt, recorded in Washington County, Pennsylvania in Deed Book "D" Vol. 3, page 668.

> > FURTHER BEING the Pittsburgh or River Vein of Coal underlying part of Tax Parcel No. 270–026–00–00–0002–00. [ . . . ]

> Complaint, ¶ 4.

> The surface estate overlying the Quiet Title Tract is owned by [the Carters]. (T.T. pp. 80). The surface estate is part of a ninety five acre farm owned by the Carter family since 1935 when they obtained the land from Farmers National Bank of Claysville, a Defendant herein, through a deed dated April 25, 1935, recorded in the Washington County Recorder of Deeds Office, Deed Book Vol. 599, p. 352 (Exhibit 1: Deed 20).

> At trial, [Consol] claimed ownership in the coal estate for the Quiet Title Tract through the deed from Margaret Simpson, et con., to J. Bayard Pollock and Robert W. Munnell, dated February 29, 1906, and recorded in the Washington County Recorder of Deeds Office at Deed Book Vol. 337, p. 394. (Exhibit 1: Deed 7). [The Carters] asserted that the deed dated June 28, 1840, from Joseph Carroll, et ux, to Francis [Moffitt] recorded in Washington County Recorder of Deeds, Deed Book Vol. 3D, p. 668,

reserved the coal on the Quiet Title Tract. (Exhibit 1: Deed 1). They contend that in the 1906 deed, Simpson retained interest and title to the Quiet Title Tract and that Simpson's interest, along with the surface rights, vested with Farmers National Bank of Claysville which conveyed all of the interest, including the Quiet Title Tract, to [the Carters'] predecessors, J. Harry Carter and Adelaide Carter, who conveyed all interest to [the Carters] herein by deed dated April 26, 1971, and recorded at Deed Book Vol. 1336, p. 286, and deed dated January 8, 1978, and recorded at Deed Book Vol. 1814, p. 48 (Exhibit 1: Deeds 26, 28).

\* \* \*

The [trial court], on October 13, 2006, issued a FINAL DECREE and found that Consol held fee simple title with 100% interest, free and clear of all encumbrances to the Quiet Title Tract and entered judgment in favor of [Consol] and against [the Carters]. Post Trial Motions were filed, which the [trial court] denied. This timely appeal ensued.

Trial Court Opinion, 10/5/07, at 1, 2–3, 1 (footnotes omitted). Thereafter, the trial court directed the Carters to file a concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b). The Carters have complied with the court's directive, and the court has filed an opinion addressing the claims.

■■■ ¶ 3 The Carters now present the following issues on appeal for our consideration:

1. Does the exception and reservation clause in the Pittsburgh or River Vein of Coal severance deed except and reserve all of the Pittsburgh or River Vein of Coal, mining rights and surface waivers?

2. Does the support estate belong to the Carters if any interest in the Pittsburgh coal was reserved in the 1840 deed?

The Carters' Brief, at 5. Initially, we note our standard of review in addressing these claims. In reviewing an action to quiet title, an appellate court's review is limited to determining whether the findings of fact are supported by competent evidence, whether an error of law has been committed, and whether there has been a manifest abuse of discretion. *Regions Mortgage, Inc. v. Muthler,* 585 Pa. 464, 889 A.2d 39, 41 (2005). "Ordinarily, an appellate court will not reverse a determination of the trial court in a quiet title action absent an error of law or capricious disregard of the evidence." *Birdsboro Municipal Authority v. Reading Company and Wilmington & Northern Railroad,* 758 A.2d 222, 225 (Pa.Super.2000).

■■■ ¶ 4 Moreover, we additionally note the underlying principles that are key to an understanding of the Carters' arguments in support of their issues.

Pennsylvania law recognizes three discrete estates in land: the surface estate, the mineral estate, and the right to subjacent (surface) support. *Hetrick v. Apollo Gas Company,* [415 Pa.Super. 189, 608 A.2d 1074, 1077 (1992).] Because these estates are severable, different owners may hold title to separate and distinct estates in the same land. *Id.* "Where there is a separation of the minerals from the surface, the owner of the mineral estate owes a servitude of sufficient support to the superincumbent estate." *Smith v. Glen Alden Coal Co.,* [347 Pa. 290, 32 A.2d 227, 235 (1943)] (citing *Graff Furnace Co. v. Scranton Coal Co.,* [244 Pa. 592, 91 A. 508 (1914))]. In Pennsylvania, this servitude of subjacent support is, as noted above, a severable estate in land and is sometimes

referred to in this Commonwealth as the "third" estate. *Id. See Jones v. Wagner*, 66 Pa. 429, 434 (1870) (adopting the English Common Law rule concerning subjacent support and recognizing this right as a "third estate" in land in Pennsylvania).

*Consolidation Coal Company v. White*, 875 A.2d 318, 326 (Pa.Super.2005). While "[i]t is well established under Pennsylvania law that it is the owner of the surface land who has the proprietary right to support of the surface[,] ... [i]t is equally well settled that this right may be waived either expressly or by implication." *Id.* (citing *Commonwealth v. Fitzmartin*, 376 Pa. 390, 102 A.2d 893, 895 (1954)). Thus, "[w]here there is a separation of the minerals from the surface, the owner of the mineral estate owes a servitude of sufficient support to the superincumbent estate" *unless* the owner of the surface estate relinquishes, by contract or by waiver, the right of subjacent support. *Id.* However, any "such relinquishment should not be implied in the absence of language clearly indicating the intention of the parties to that effect." *White*, 875 A.2d at 327 (citing *Fitzmartin*, 102 A.2d at 896).

■ ¶ 5 Keeping our standard of review and principles pertaining to the three separate estates in land in mind, we will now address the Carters' claims. In their first issue, the Carters argument is two-fold. First, the Carters contend that the language contained in the "exception and reservation" clause in the 1906 deed reserved "all of the Pittsburgh or River Vein of Coal" with mining rights and waiver of surface damage to the 1.87 acre tract of land at issue to Margaret Simpson, land-owner predecessor in title to the Carters. The Carters' Brief, at 12. The Carters assert that the language of the "exception and reservation" clause is clear and unambiguous and conclusively establishes the parties' intentions. Thus, they argue that the trial court "erred in considering testimony outside the four corners of the deed to interpret the coal interest excepted and reserved." *Id.* Secondly, the Carters, in the alternative, posit that even if the trial court did not err in considering evidence outside the language of the deed, the court abused its discretion in finding that the intention of the parties was to transfer the coal rights at issue, when Consol admitted that fifty dollars per acre consideration was paid for each tract of coal purchased by the 1906 deed, except for the disputed tract. Thus, the Carters allege Consol's predecessors' failure to pay any consideration for the tract of coal at issue, coupled with the language of the "exception and reservation" clause, "lead inexorably to the conclusion that the coal, mining rights and support waivers under the ... tract were not conveyed to the coal company's predecessor." The Carters' Brief, at 12. The pertinent parts of the May 29, 1906, deed from Margaret Simpson and L.H. Simpson, her husband, to J. Bayard Pollock and Robert W. Munnell reads as follows:

> Excepting and Reserving, however, all the coal of the Pittsburg[h[1]] or River Vein in and underlying all the following described tract of land, which is included within the description hereinabove set forth, bounded and described as follows, to wit:
>
> Beginning at a post; thence by lands of the said Margaret E. Simpson, North

---

1. We note that "[i]n 1890 the United States Board on Geographic Names decided that the 'h' would be dropped from all place names ending in—'burgh'. The citizens of Pittsburgh, Pennsylvania, and its environs refused to comply. In 1911, the United States Board on Geographic Names reversed its decision and restored the 'h' to Pittsburgh, Pennsylvania." *White*, 875 A.2d 318, 321–22 n. 2.

7° West 23.4 perches to a white oak; thence South 71° East 24.4 perches to a post; thence by land of the said Margaret E. Simpson, South 37° West 15.2 perches to a hickory; thence South 76½° West 11.4 perches to the place of beginning, Containing One (1) acre, three (3) roods and twenty (20) perches, strict measure.

This being the coal reserved in deed of Joseph Carroll, et ux., to Francis Moffitt, recorded in Washington County, Pennsylvania in Deed Book "D" Vol. 3, page 668.

Together with all and singular the rights, liberties, privileges, hereditaments and appurtenances whatsoever thereunto belonging or in anywise appertaining; and all the estate, right, title, interest, property, claim and demand whatsoever of the said parties of the first part, in law, equity or otherwise howsoever, of, in and to the same and every part thereof.

To have and to hold the said Pittsburg[h] or River Vein of coal in and underlying said above described tract of land, together with the mining rights and all other privileges hereinbefore mentioned, without any liability for any injury whatsoever as aforesaid, the hereditaments and premises, hereby granted or mentioned, and intended so to be, with the appurtenances, unto the said parties of the second part, their heirs and assigns, to and for the only proper use and behoof of the said parties of the second part, their heirs and assigns forever, subject to the exception and reservation above set forth.

Consol's Trial Exhibit 1, Subsection 7. Consol argued and the trial court found that, in referencing the 1840 conveyance by Joseph Carroll to Francis Moffitt, an ambiguity was created as to what coal rights were retained by Margaret Simpson in the 1906 deed. The specific language at issue in the June 28, 1840, conveyance is reproduced as follows:

Beginning at a post; thence by lands of the said Francis Moffitt, north seven degrees west twenty three and four tenth perches to a white oak thence south seventy one degrees East twenty four and four tenths perches to a post thence by land of the said Joseph Carroll south thirty seven degrees west fifteen and two tenths perches to a hickory thence south seventy six and one half degrees west Eleven and four tenths perches to the place of Beginning. Containing one acre, three roods and twenty perches, strict measure.

Together with all and singular the hereditaments and appurtenances thereunto belonging the said Grantors reserving to themselves their heirs and assigns the privilege of the Coal which may be on the said premises using that privilege in such a way as not to do more injury to the land than may be necessary for its enjoyment and Whereas the Contemplated Baltimore and Ohio [R]ailroad has been laid out so as to pass through the premises and the said Joseph Carroll hath agreed to give the Company the free use of so much of his land as may be necessary for the passage of the said road this Conveyance is made subject to the right of the said Company to carry their road over the premises hereby granted.

Consol's Trial Exhibit 1, Subsection 1. Consol maintains that the reference in the 1906 deed to the 1840 deed should be interpreted to mean that Margaret Simpson did not retain any interest in the Quiet Title Tract at issue, but rather she conveyed the Quiet Title Tract subject to only the reservation contained in the 1840 deed between Joseph Carroll and Francis Moffitt. In the alternative, Consol posits

that "[t]he 1840 reservation simply created a license or easement to use the coal which expired or was abandoned by operation of law in 1853" when Joseph Carroll sold the balance of his farm to Melchi Scott. Consol's Brief, at 5. Consol asserts that, "[a]t that time, the only right Carroll had left to his original farm was the 1840 license/easement and he had *not* retained any legal right to cross the 141 acre parcel to access the Quiet Title Tract." *Id.* at 16. Thus, Consol concludes that the "license/easement he created in 1840 was abandoned by operation of law in 1853, if not sooner." *Id.*

¶ 6 Our interpretation of the 1906 deed is guided by the following principles:

When construing a deed, a court's primary object must be to ascertain and effectuate what the parties themselves intended. *Mackall v. Fleegle,* 801 A.2d 577, 581 (Pa.Super.2002). The traditional rules of construction to determine that intention involve the following principles. First, the nature and quantity of the interest conveyed must be ascertained from the deed itself and cannot be orally shown in the absence of fraud, accident or mistake. *Id.* We seek to ascertain not what the parties may have intended by the language but what is the meaning of the words they used. *Id.* Effect must be given to all the language of the instrument, and no part shall be rejected if it can be given a meaning. *Id.* If a doubt arises concerning the interpretation of the instrument, it will be resolved against the party who prepared it. *Id.* ... To ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed.

*White,* 875 A.2d at 326–27. However, "[w]here the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, *while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred."* *Wilkes–Barre Township School District v. Corgan,* 403 Pa. 383, 170 A.2d 97, 98–99 (1961).

¶ 7 In this case, the explicit language of the exception and reservation clause reserves "all the coal of the Pittsburg or River Vein in and underlying all of the ... described tract of land," which is specifically set forth in the reservation. The habendum clause further supports the existence of a reserved interest in the coal on the Quiet Title Tract. In particular, the habendum clause, as set forth above, reads, "[t]o have and to hold the said Pittsburg[h] or River Vein of coal in and underlying said above described tract of land, together with the mining rights and all other privileges hereinbefore mentioned, without any liability for any injury whatsoever as aforesaid, the hereditaments and premises, hereby granted or mentioned, and intended so to be, with the appurtenances, unto the said parties of the second part, their heirs and assigns, to and for the only proper use and behoof of the said parties of the second part, their heirs and assigns forever, *subject to the exception and reservation above set forth."* Consol's Trial Exhibit 7 (May 29, 1906, Deed) (emphasis added). Notwithstanding the congruity of the exception and reservation clause with the habendum clause, the trial court found that an ambiguity exists based merely upon the recital clause. The trial court's finding ignores the purpose of a recital clause.

¶ 8 The recital clause, "[t]he clause beginning, 'Being the same premises' [or, as in this instance, 'This being the coal'] is obviously put into a deed for the purpose of calling attention to the links in the chain of title." *Fidelity Mortgage Guarantee Co. v. Bobb*, 306 Pa. 411, 160 A. 120, 121 (1932). "It is placed there for that purpose rather than for the purpose of completely identifying the property conveyed." *Id.* The purpose of the habendum clause in a deed, on the other hand, "is to determine what estate passes." *Ontelaunee Orchards, Inc. v. Rothermel*, 139 Pa.Super. 44, 11 A.2d 543, 545 (1940). "The habendum may enlarge, expound, qualify or vary the estate granted in the premises of the deed." *Id.* Thus, "where the recital and operative part of the deed conflict, the operative part prevails if certain and definite." *Id.* at 545–46. " 'The grant [in a deed] cannot be diminished by a mere recital in the description.' " *Id.* (quoting *Tate v. Clement*, 176 Pa. 550, 35 A. 214 (1896)). Accordingly, applying the rules of construction to the terms and language of the 1906 deed, it is evident that the operative language of the deed is certain and definitive, and that Margaret Simpson's intent was to retain title to the Pittsburgh or River Vein of coal for the Quiet Title Tract.[2] The parties do not dispute that when Margaret Simpson acquired ownership of the land at issue, she received a complete ownership of all the estates in, under and above the land. Consol, as part of its trial exhibits, included the following diagram of the chain of title for the Quiet Title Tract:

---

**2.** Consol concedes that, "[i]f Margaret Simpson had concluded ... the exception and reservation clause after the metes and bounds description of the Quiet Title Tract ... there would have been no question as to the intent of the parties." Consol's Brief, at 8. Consol's various arguments in support of its position are based entirely on the recital clause.

**Title into Margaret E. Simpson**

Joseph Carroll
Eliza Carroll, his wife
Land
1A. 3R. 20P.
(Quiet Title Tract)
G.W.
D.B. 3D-668 (2)
Dt: 6-28-1840
Rx: 9-16-1846

James Irvien [sic]
S.W.
50 A.
D.B. 2"O"-177 (1)
Dt: 11-27-1830
Rx: 1-25-1831

141 A.
26 P.
G.W.
D.B. 3T-151 (6)
Dt: 3-30-1853
Rx: 12-9-1857

Francis Moffitt (Moffet)
Nancy Moffitt, his wife
2 Lots
No. 1 - 50 A.
No. 2 - 1 A 3 R
20 P.
G.W.
D.B. 3D-669 (3)
Dt: 3-22-1843
Rx: 9-16-1846

Samuel Farabee
Pernina Farabee, his wife
G.W.
55 A.
D.B. 6C-185 (8)
Dt: 11-24-1857
Rx: 6-12-1884

Melchi (Melachi) Scott
Elizabeth Scott, his wife
18 A.
22 P.
G.W.
D.B. 3Q-467 (7)
Dt: 11-14-1854
Rx: 11-20-1856

Thomas Post[1]
Sarah Jane Post, his wife
Land
61 A. 144 P.[2]
(Quiet Title Tract
included as part of)
G.W.
D.B. 3M-235 (4)
Dt: 5-23-1850
Rx: 8-27-1853

Stewart T. Craft
Louisa Craft, his wife
G.W.
10 A.
D.B. 3M-237 (5)
Dt: 3-16-1852
Rx: 8-27-1853

William Elliot
*Intestate*
DOD: Between 11-16-1856 and 10-2-1875
Bond Book: 9-36 (9)

Heirs
Margaret Simpson (Dght.)
Mary Willamina Spillman "Spellman" (Dght.)
& Joseph, her husband
Land
145 A. 6 P.
Q. C.
D.B. 6C-146 (11)
Dt: 4-6-1877
Rx: 6-12-1884

Leonadus Simpson
G.W. (12)
3 A.
D.B. 208-311
113 P
Dt: 10-28-1889
Rx: 3-30-1897

Agreement
5G-364 (10)
Dt: 8-2-1876
Rx: 4-30-1877
(Exchange of property)

Margaret E. Simpson
L. H. Simpson, her husband

(See Page 2)

---

[1] No other deeds into Thomas Post et ux.

[2] No explanation of record for differences in acreage between 1843 and 1850 deeds.

Page 1

Margaret E. Simpson
L. H. Simpson, her husband

All PVC &
150.197 A.
E/R coal of
1 A 3 R 20 P
G. W.
D.B 337-394 (13)
Dt: 5-29-1906
Rx: 7-2-1906

J. Bayard Pollock (1/2 Int.)
Robert Munnell (1/2 Int.)

---

Consol's Trial Exhibit 2. Thus, because Margaret Simpson had title to the surface estate and the mineral estate, as well as the right to support, we agree with the

Carters that the unambiguous language of the reservation in the 1906 deed to J. Bayard Pollock and Robert Munnell resulted in her retaining title to all three estates in relation to the Quiet Title Tract. Accordingly, the Carters, as successors in title to Margaret Simpson, own, in fee, the Quiet Title Tract.

¶ 9 Nonetheless, even if we were to find that the recital clause created an ambiguity, which permitted the consideration of extrinsic evidence to interpret the intent of the parties to the 1906 deed, we would still find that the intent of Margaret Simpson was to retain ownership of the coal rights at issue to the Quiet Title Tract. In determining that Consol held fee simple title with 100% interest, free and clear of all encumbrances to the Quiet Title Tract, the trial court reasoned:

> That the 1840 deed retained a license and easement to the surface or outcropping coal only. [This conclusion was based upon the testimony of Terrence Morris, an expert in geology and James Boyd, a mining engineer, both presented by Consol, who testified, respectively, that the Ten Mile Vein of Coal, a vein of coal near the surface, was the only coal known and available to anyone in 1840 and that it was typical of the day for landowners, and particularly farmers, to mine and use outcropping coal to burn for heating, cooking and blacksmithing.]
>
> The [trial court] next examined the ownership status of that license and/or easement. In 1853, Joseph Carroll sold his farm to Melchi Scott[.] Joseph Carroll did not retain any legal right to cross the farm now owned by Melchi Scott to access the Quiet Title Tract of one (1) acre, three (3) roods, twenty (20) perches tract.... When Carroll sold his farm without any right to access this parcel, this license or easement was abandoned by operation of law. Being

that the Quiet Title parcel was within a larger parcel, there was no access granted over the larger parcel to get to the one acre tract. The [trial court] therefore found that the 1853 [deed] extinguished any privilege or right to the coal that Joseph Carroll retained.

With Carroll and the Carroll heirs retaining no rights to the Quiet Title Tract, the next step for the [trial court's] analysis of [Consol's] position is to determine the effect of the 1906 Simpson deed. Margaret Simpson owned 150.197 acres of land in the East Finley Township area. On or around 1906, J. Bayard Pollock and Robert Munnell were buying coal in this region, presumably to obtain a complete coal field. The apparent going rate was Fifty Dollars ($50) per acre for the coal. Presented at trial were eleven other deeds which conveyed coal and coal rights to those buyers at the price of Fifty Dollars ($50) per acre. Although those deeds were alike in many ways, some significant differences were also evident. The scrivener or scriveners of these deeds is unknown, but [the trial court] found that the deeds were likely drafted by the purchasers, Pollock and Munnell.

The 1906 deed from Simpson to Pollock "granted and conveyed ... all the coal of the Pittsburg(h) or River Vein in and under all that certain tract of land situate in East Finley Township, Washington County, Pennsylvania, bounded and described as follows, to wit; ... 150.197 acres." That operative language severed the coal from the surface estate for the entire parcel and conveyed the entire coal tract to Pollock and Munnell. The language in the deed further on continued and "excepted and reserved, however, all the coal of the Pittsburgh River Vein ... containing (1) one acre, three (3) roods, and (20) perches (1.875

acres strict measure), this being the coal reserved in the deed of Joseph Carroll, et ux., to Francis Moffitt in Deed Book 3D, page 668." The [trial court found] that the exception and reservation clause in the deed did not reserve rights to Margaret Simpson but rather put the grantees, Pollock and Munnell, on notice of the existence of the previous rights that were retained by Joseph Carroll. As the [trial court had] found above, Joseph Carroll did not at that point have any rights into the coal. Therefore, this clause simply put the grantees on notice that there may have been a cloud on the title.

From the evidence presented, [the trial court] found that the coal company, through Pollock and Munnell acting as agents in 1906, did not pay the fifty dollar per acre for this Quiet Title Tract of 1.87 acres. The buyers paid Seven Thousand Five Hundred Dollars ($7,500), and it was approximately Ninety Three Dollars ($93) less than what Fifty Dollars ($50) per acre for the entire tract would cost. Whether that means they didn't pay for this one plus acre tract or that they paid slightly less than Fifty Dollars ($50) per acre is not meaningful. The payment made does not establish that Simpson retained that interest or did not convey the coal rights for this 1.87 acre tract. There is no logical reason for Simpson to retain the coal, nor is there any indication that her intent was to retain the coal. The fact that Pollock and Munnell did not pay the fifty dollar per acre for the entire tract could be because this tract was not free of all clouds or issues. A review of the chain of title by the purchasers, Pollock and Munnell, would have revealed the 1840 deed which reserved some type of

interest in the coal in 1840. Although the [trial court] has found that right abandoned in 1853, the abandonment would not have appeared in any chain of title. Therefore, this exception and reservation clause was simply added to put the grantees on notice. The "cloud" on the title could just as easily be the explanation why Simpson was paid Fifty Dollars ($50) an acre less the one (1) acre, three (3) roods, and twenty (20) perches tract. The 1906 deed severed all of the mineral/coal estate from the surface estate and transferred ownership of the coal estate to Pollock. From Pollock, through the chain of title, Consol is currently vested with the coal estate.

Trial Court Opinion, 10/5/07, at 6–8 (references to notes of testimony and exhibits omitted).

¶ 10 In light of the testimony of Jon Carter at trial regarding the location of the Simpson homestead in relation to the Quiet Title Tract, coupled with the monies paid by Pollock and Munnell per acre for coal rights, we find that Margaret Simpson's retention of the Pittsburgh or River Vein of coal with regard to the Quiet Title Tract to be a more rational and probable agreement based on the circumstances at the time of entering the agreement than that arrived at by the trial court. Jon Carter testified at trial that the home in which he and his wife, Patricia Carter, presently live was built in 1863 by Margaret Simpson, and the barn on the property was built in 1906. N.T., 8/16/06, at 97. He further testified that the front of the house touches the Quiet Title Tract, as illustrated by the following map of the property. *Id.* at 82 and 95–96.

Consol's Trial Exhibit 4. Moreover, Consol acknowledges "that Pollock and Munnell were paying $50.00 per acre for coal and mining rights and that by subtracting the Quiet Title Tract (1.875 acres) from the remainder of the coal sold in the 1906 deed (150.197 − 1.875 = 148.322) and multiplying that figure by $50.00 per acre you arrive at the purchase price ($7,416.10)." Consol's Brief, at 9. However, while Consol "concedes that the Carters' arithmetic is correct, it disputes the conclusion that this calculation is proof that Margaret Simpson retained 1.875 acres of coal." *Id.* Rather, they posit that "[t]he more logical conclusion is that Margaret Simpson and/or Pollock and Munnell recognized that the 1840 deed created some cloud on the title[,]" as the trial court determined. *Id.* We find that Consol's reasoning and the trial court's finding in this regard is mere speculation. The case cannot be decided on inference or conjecture as to actual inten-

tions. Thus, even if an ambiguity existed in the 1906 deed due to the language of the recital clause, we find that the more plausible explanation of the intent of the parties of the 1906 deed is that Margaret Simpson would retain the Pittsburgh or River Vein of coal located in the Quiet Title Tract, due to the close proximity of the Simpson home to the disputed tract and the failure of consideration for the exact acreage of that tract.

¶ 11 Based on the foregoing, we find that the trial court erred in its determination that Consol held fee simple title with 100% interest, free and clear of all encumbrances to the Quiet Title Tract.[3] Accordingly, we reverse the judgment entered in favor of Consol and remand with directions for entry of judgment in favor of the Carters.

---

**3.** Due to our disposition of the Carters' first issue on appeal, we need not reach the merits of their remaining issue.

¶ 12 Judgment reversed. Case remanded. Jurisdiction relinquished.